NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

KELLY BEGEN,                          :
                                      :
            Plaintiff,                :        Hon. Dennis M. Cavanaugh
                                      :
    v.                                :        **OPINION**
                                      :
                                      :        Civil Action No: 10-4477 (DMC)
COMMISSIONER OF SOCIAL                :
SECURITY,                             :
                                      :
            Defendant.                :
                                      :

DENNIS M. CAVANAUGH, U.S.D.J.:


        This matter comes before the Court upon the appeal of Kelly Begen ("Plaintiff") from the

final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's

claims for a period of disability and disability insurance benefits under Title II of the Social

Security Act ("SSA"). This Court has jurisdiction over this matter pursuant to 42 U.S.C. §§

405(g) and 1383(c)(3).  No oral argument was heard pursuant to Rule 78 of the Federal Rules of

Civil Procedure.

        As detailed below, the final decision entered by the Administrative Law Judge ("ALJ") is
**affirmed.**


## I. BACKGROUND

### A.        PROCEDURAL HISTORY

On June 17, 2004, Plaintiff filed a request for Social Security Disability Insurance

("SSDI") for a disability that allegedly began on June 13, 2004. (Administrative Transcript 27, hereinafter, "Tr."). The application was denied on August 29, 2005. (Tr. 35). A request for reconsideration was made on October 11, 2005 and denied on May 9, 2006. (Tr. 27, 58). No additional evidence was submitted upon reconsideration.

Plaintiff filed a timely request for a hearing on May 19, 2006, citing breast cancer, uterine fibroids, lower back pain, post traumatic stress disorder ("PTSD"), panic disorder, right shoulder problem, and arthritis/bursitis in her right arm. (Tr. 51-52). No additional evidence was submitted. A hearing was held in Hackensack, New Jersey on February 5, 2008 in front of ALJ Gerald J. Ryan (hereinafter, "ALJ Ryan"). (Tr. 27). Dr. Martin Fechner also testified to Plaintiff's illnesses as an impartial medical expert. ALJ Ryan ruled against Plaintiff on March 24, 2008. (Tr. 24-34). A request for review was denied by the Appeals Council on August 9, 2010. (Tr. 6).

Plaintiff filed a timely complaint in this Court pursuant to Title II of § 205(g) of the Social Security Act ("SSA") and 42 U.S.C. § § 405 (g) and 1385(c)(3).

### B.   FACTUAL HISTORY: ALJ FINDINGS

On March 24, 2008, ALJ Ryan denied Plaintiff's disability claim. (Tr. 24-34). ALJ Ryan made seven findings: (1) Plaintiff met the insured status requirements of the SSA through June 30, 2007; (2) Plaintiff engaged in substantial gainful activity since June 13, 2004, the alleged onset date; (3) Plaintiff possessed severe impairments of degenerative disc disease, right shoulder pain, PTSD and panic attacks; (4) Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20

2

C.F.R. § 404.1567(b); (6) Plaintiff was capable of performing past relevant work as a cashier, which does not require the performance of work-related activities precluded by Plaintiff's RFC; and (7) Plaintiff had not been under a disability, as defined in the SSA, from June 13, 2004 through the date of the decision. (Tr. 24-34).

### C.     PLAINTIFF'S MEDICAL HISTORY AND EVIDENCE

#### 1.     Relevant Medical History Pre-Alleged Onset Date

In June of 1998, Plaintiff was admitted to the Valley Hospital in Ridgewood, New Jersey due to a work related back injury. (Tr. 31). There, Plaintiff underwent decompressive hemilaminectomies and a partial diskectomy. (Tr. 31, 177). Plaintiff was discharged the following day with the instruction to avoid bending and regular lifting. (Tr. 177-78).

Thereafter, Plaintiff visited Dr. Isaiah Florence at Englewood Hospital & Medical Center on numerous occasions between November 2000 and November 2003, complaining of neck, back and leg pain. (Tr. 529-52).  Dr. Florence gave impressions of Plaintiff's condition including: mild to moderate scoleosis, failed back syndrome, a component of fibromyalgia, possible facet arthropathy, and a possible herniated disk. Id. To treat Plaintiff's pain, Dr. Florence prescribed a regimen of medication including: Pamelor, Parafon, Forte, Vicodin, Baclofen and Lorcet; and Plaintiff began an at-home exercise program. Id.  Plaintiff was resistant to the suggestion of behavior modification and taking antidepressants. Id.

In the last visit before the alleged onset date, Dr. Florence noted that Plaintiff was still working but that the pain limited her functions. (Tr. 552).  Additionally, Dr. Florence again noted possible facet arthropathy and fibromyalgia. Id. Dr. Florence suggested Plaintiff seek a psychological follow up but Plaintiff again refused antidepressants. Id.

Plaintiff's was admitted to Englewood Hospital on May 11, 2004, for a biopsy and

3

lumpectomy as treatment for breast cancer. (Tr. 198-203).   There is no evidence of a reoccurrence of breast cancer since this treatment.

### 2.    Social Security Filings

On October 14, 2004, Plaintiff filed a disability report. (Tr. 83-92).  She noted that she had pain/numbness in her right arm, back pain, breast cancer, severe headaches, depression, anxiety, fatigue, scoleosis and arthritis. (Tr. 84, 91).  She also alleged that she could not use her arm, lift, write easily, sit or stand for too long or walk far because of pain. (Tr. 84-91).

According to the function reports filed by Plaintiff on November 1 and 22 of 2004, she could not fall asleep or stay asleep. (Tr. 104, 121).  She also noted that she needed help with daily activities including, but not limited to, dressing, bathing, cutting food, and preparing meals. Id. Plaintiff does not drive by choice but was capable of taking public transportation, going food shopping with her daughter and handling her accounts. (Tr. 105, 123).   In an updated function report on April 21, 2006, Plaintiff reported that she was on new medication which made it hard for her to get out of bed, made her nauseous and caused her pain and headaches. (Tr. 151).  She noted that her ability to pay attention is affected by the level of pain and fatigue. (Tr. 156). Additionally, she claimed she did not follow written instructions well when fatigued and stress caused her to have panic attacks. (Tr. 156).

### 3.    Medical History After Alleged Onset Date

Plaintiff alleged that her disability began on June 13, 2004. (Tr. 84).  Plaintiff claimed that she had degenerative disk disease, breast cancer, PTSD, and depression. Id. Each ailment and the relevant medical history is discussed individually below.

#### a.    **Arm/Shoulder**

On June 14, 2004, Plaintiff slipped and fell at work, causing her to fracture her arm. (Tr.

4

206-14).   After seeing an orthopedist, Plaintiff learned that she had a right distal humerus fracture (fracture of the right arm), and chose surgical stabilization as a remedy for the pain she was experiencing. (Tr. 204-15, 592).  The surgery was completed at Bergen Regional Medical Center in Paramus, New Jersey on June 18, 2004. (Tr. 216-28).

After the surgery, Plaintiff continued to see her orthopedist, Dr. Howard Baruch, M.D., who recommended that she begin physical therapy, which she did in August of 2004 at the Kessler Rehabilitation Center. (Tr. 401).  In the first progress report from August 30, 2004, her physical therapist noted increased Range of Movement ("ROM"), improved functional status and decreased muscle spasms, but also that she still had pain, she could not cook, clean or do laundry, there was still numbness in her right hand, and there was some scapular winging. (Tr. 393).[1]

In a report at the end of September 2004, the physical therapist noted that Plaintiff's strength increased grossly. (Tr. 385).  Additionally the physical therapist noted increases in ROM and full internal and external rotation. Id. Plaintiff still complained that she had pain and was unable to perform all household functions. Id. In October 2004, the physical therapist again noted that Plaintiff had increased strength and ROM and decreased pain and improved functional status. (Tr. 374.).   However, she still had less strength and less ROM then normal, and some pain. Id.

Through the rest of her physical therapy, Plaintiff continued to complain of some pain in her shoulder. (Tr. 356).  In the initial consultation with Kessler Rehabilitation Center, Plaintiff's movements in the elbow and shoulder were rated at "approximately two" on a five-point scale.

---

[1] According to the ALJ's Medical Expert, Dr. Martin Fechner, scapular winging means "that the back of the scapula looks through the muscle and you can see a bulge. It usually doesn't

5

By comparison, her left was approximately a four plus on the same scale. (Tr. 399-400). By October they were rated approximately four on the same scale. Overall, she was said to tolerate the sessions well, but was still experiencing some pain. (Tr. 360, 362, 366, 369, 371).

Throughout the course of physical therapy, Plaintiff continued regular visits with Dr. Baruch, who noted her improvements. On September 1, 2004, Dr. Baruch stated that she could perform "light duty [work] with no heavy use of the right upper extremity at this time or heavy lifting with the right upper extremity." (Tr. 579). Thereafter, he prescribed her an electric stimulator to supplement the bone healing.

In a report on November 8, 2004, Dr. Baruch noted that Plaintiff's right arm was tender over the distal humerus, that she had a decreased ROM in her right elbow, and that she was limited to five pounds when lifting, carrying, pushing, and pulling with her right upper extremity. (Tr. 230-32). She had no limitation, however, on standing, walking or sitting, or any other conditions that limited her ability to do work related activities. Id. In a range of motion chart, Plaintiff's elbow flexion in the right was 20-160, in the left was 0-160 and she had muscle weakness of four or five in the right biceps/triceps (considering five normal). (Tr. 233-34). In an additional ROM chart completed sometime after April 2005, ROM was showing a shoulder forward elevation of 0-130, abduction 0-120, adduction 0-20, internal rotation 0-50, external rotation 0-70. (Tr. 238).

On December 1, 2004, Dr. Baruch reported Plaintiff's expanded ROM and stated that she could perform a "light sedentary job with no heavy lifting using the right upper extremity." (Tr. 575). Dr. Baruch expanded his diagnosis on December 29, 2004, noting that while Plaintiff had

_____

mean too much." (Tr. 41, 646).

some pain there was no fracture in the shoulder or elbow and she could perform a sedentary job with no use of the right upper extremity. (Tr. 574).

On January 26, 2005 after reviewing an MRI taken at the Teaneck Radiology center, Dr. Baruch noted that Plaintiff was capable of performing a light duty job with no over head lifting and no lifting with the right shoulder over 25 pounds. (Tr. 573).  The MRI reviewed by Dr. Baruch showed some evidence of tendinosis in the biceps and a tendon as well as tenosynovitis and mild subcoracoid bursitis, but no evidence of a rotator cuff tear. Id.

In April of 2006, Dr. Baruch noted that there was a right shoulder impingement that could be causing Plaintiff's pain. (Tr. 572). To relieve the pain, he planned an arthroscopy with subacrimonial decompression. Id.

<b>b.     Breast Cancer</b>

After having a lumpectomy and biopsy of her left breast, Plaintiff attended numerous follow-up appointments to examine the state of her condition.

On October 14, 2004, Plaintiff had a post operation follow-up which found no residual microcalcifications, and recommended a follow-up every six months for two years. (Tr. 295).  In December 2004, June 2005 and November 2005 there was no evidence of a malignancy in these follow-up procedures. (Tr. 264-67, 286, 345, 564).

Additionally, in November of 2007 after a mammogram, a fibroglandular pattern was found, but there were no significant changes from Plaintiff's last scan. (Tr. 517).

<b>c.     Back</b>

After the alleged onset date of disability, Plaintiff continued to see Dr. Florence. For three visits from September 2004 through March 2005, Dr. Florence noted that Plaintiff had a

decreased range of motion of the lumbar spine and possible facet arthropathy and fibromyalgia. (Tr. 553-56). In one visit Dr. Florence encouraged her to return to work. (Tr. 555). In the same visit and thereafter, Plaintiff had negative straight leg raise tests. (Tr. 555-56). Dr. Florence continued to treat her pain with Lorcet and Flexeril. (Tr. 553-56).

In May of 2005, Dr. Vishy Rajaraman evaluated Plaintiff. (Tr. 241-45). According to Plaintiff's testimony, Dr. Rajaraman was a worker's compensation Doctor evaluating Plaintiff pursuant to her worker's compensation claim. (Tr. 649-50). He noted that her memory was normal, she had a negative straight leg raise test, mild restriction in lumbar flexion, but full ROM in lumbar extension. (Tr. 242). The test showed a herniated nucleus pulpos. (Tr. 244). Dr. Rajaraman noted that Plaintiff could continue to work without restrictions. (Tr. 243).

Plaintiff then continued to see doctors in Key West, including those at the Lower Keys Primary Care and Medical Center (hereinafter "Lower Keys Medical Center") complaining of pain in her back. (Tr. 335, 338, 341-42, 347, 419). Through numerous visits, doctors determined that she had a decreased range of motion and noted her mild scoleosis. Id. Her pain was controlled with Percocet. (Tr. 342). In one visit to Lower Keys Medical Center, an MRI found degenerative disc disease and disc space narrowing as well as disc protrusion with no direct evidence of nerve root involvement. (Tr. 348). Additionally, the rest of the spine was found to be "unremarkable." Id. The follow-up to this test noted that no orthopedist evaluation was necessary. (Tr. 418). Plaintiff left for New Jersey to be with family in December of 2005 and she was given Percocet to manage her pain for her trip. (Tr. 417).

More recently, in February of 2006 an orthopedist, Dr. David C. Perry noted some degenerative disc disease and some disc space narrowing but "nothing terrible." (Tr. 414-16).

As ALJ Ryan noted, "[Plaintiff] wanted injections for her pain, which Dr. Perry reported he could not perform, but recommended she seek pain management." (Tr. 32).

d.   **Mental Impairments**

On November 8, 2005, Plaintiff began receiving treatment at the Care Center for Mental Health in Key West, Florida. (Tr. 449). According to the initial consultation, Plaintiff stated that she had problems including: breast cancer, herpes, side effects of medicine, severe anxiety and panic attacks, and she suffered from migraines. (Tr. 449-50). The physician noted that she had no suicidal or homicidal behavior, but she had been in abusive relationships and was molested and raped by her brothers when she was a teenager. Id.

The physician's impressions were that Plaintiff suffered from emotional dysregulation, that she was fearful, depressed, anxious, and suffered from poor judgment. Additionally it was noted that she was "highly emotionally labile [which affected her] thought process." (Tr. 453). As ALJ Ryan noted, "[t]he treatment team recommended weekly outpatient therapy and monthly medication management to improve functioning and symptoms." (Tr. 32).

There is no evidence in the file that Plaintiff returned to the Care Center for Mental Health until March 6, 2006. (Tr. 446-58). Then, she was seen by Dr. Teri Beers who noted that Plaintiff had PTSD and panic disorder which was treated with Xanax and Klonopin. (Tr. 415). Plaintiff did not exhibit any evidence of a thought disorder and she had no suicidal or homicidal ideations (hereinafter, "SI/HI"). Id. It was recommended that Plaintiff return to the clinic after four to eight weeks. (Tr. 446-48). Additionally, "she was noted to have been without medications for a month and had visited her parents in New Jersey." (Tr. 32).

After the death of her daughter, the evidence shows that Plaintiff returned to see Dr.

9

Beers on three occasions. (Tr. 446-48). In these reports, Dr. Beers noted that Plaintiff suffered from PTSD, panic disorder, and in the later meetings, bereavement. Id. These disorders were being treated with Lexapro, Xanax, and Klonopin. Id. Dr. Beers noted that Plaintiff was doing well on her medication and that there was no evidence of a thought disorder and no SI/HI. Id. Additionally on November 7, 2007, Dr. Beers noted that the patient was not coping well with her daughter's death, but that her memory was "grosly [sic] intact." (Tr. 446).

On October 23, 2007, Dr. Beers sent a letter to the SSDI administrator that "[b]ecause of [Plaintiff's] mental illness and her inability to focus, she is unable to maintain steady employment." (Tr. 463). However, on January 9, 2008, Dr. Beers noted that Plaintiff could travel to New Jersey for an operation. (Tr. 528).

In addition to her visits to the Care Center for Mental Health, Plaintiff went to the hospital on July 6, 2007 for chest pains and tearfully stated that she was profoundly depressed. (Tr. 468-69). The hospital, Lower Keys Medical Center, found that Plaintiff was stable and more hopeful when she was given Lexapro. (Tr. 468). Additionally, the hospital noted that Plaintiff could perform all activities of daily living without assistance. (Tr. 477). Plaintiff was also able to move all four extremities with equal strength and denied numbness or tingling. Id. Plaintiff remained in the hospital until the following day.

### D.   CONSULTATIONS

#### 1.   Physical Consultation

On May 1, 2006, Dr. H. Goldbas completed a physical RFC assessment regarding

Plaintiff.[2] (Tr. 420-27).  It was noted that based on the evidence, Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently. (Tr. 421). Additionally, it was found that Plaintiff could stand, walk, or sit for about six hours in an eight-hour workday. Id. The report also noted that Plaintiff could climb a ramp or stairs and balance frequently; stoop, kneel, crouch or crawl occasionally; and never climb a ladder, rope or scaffolds. (Tr. 422).  There were no other limitations noted. (Tr. 423-24).

## 2.    Mental Consultations

Dr. Charles S. Hasson, a Department of Labor Division of Disability Determination Services ("DDS") physician, completed a mental status examination of Plaintiff dated May 17, 2005. (Tr. 246-52). Dr. Hasson noted that Plaintiff told him that she had panic attacks and received treatment for anxiety from her family doctor. (Tr. 247). She stated that she had difficulty with her family and was stressed and unhappy about not having good relationship with them. Id. According to the report, Plaintiff told Dr. Hasson that she made breakfast for herself and was able to wash and groom herself without assistance, however, she could not clean her home. (Tr. 248). She reported a pattern of abuse by boyfriends and her father from age sixteen to twenty-two, as well as sexual assault by both of her brothers from ages twelve to thirteen. (Tr. 247-48).

In his conclusions, Dr. Hasson found that Plaintiff was "highly dramatic in her choice of words to discuss her emotional state. [Plaintiff] has a histrionic style." (Tr. 250).  He concluded that intellectually, Plaintiff was in the low average range. Id. She evidenced "no signs of formal

---

[2] An RFC assessment determines the work a Plaintiff is capable of completing despite their impairments.

thought disorder." Id. Additionally, "[Plaintiff] showed mild-to-moderate impairment in concentration and short-term memory." Id. She was unable to count down from 100 by sevens. Id. Plaintiff denied any thoughts of suicide or aggressive behavior. Id. Finally, Plaintiff appeared disingenuous when describing alleged hallucinations and hearing voices. Id.

Dr. Hasson concluded that Plaintiff had an adjustment disorder with mixed, anxious, and depressed mood and a pain disorder associated with psychological factors. (Tr. 251). Additionally Dr. Hasson found Plaintiff to have a mixed personality disorder. Id. Dr. Hasson, in a Global Assessment of Functioning (hereinafter, "GAF"), diagnosed Plaintiff at fifty, which was equal to her prior score. Id.

An additional mental RFC was completed for Plaintiff on May 27, 2005 by a DDS physician. (Tr. 253-56). In this assessment Plaintiff was not significantly limited in her ability to remember locations and work-like procedures, understand and remember short and simple instructions, carry out short and simple instructions, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted, be aware of normal hazards and take appropriate precautions, and travel in unfamiliar places or use public transportation. (Tr. 253-54). Additionally she was classified as "not significantly limited" in all social interaction measures. Id.

Plaintiff was considered moderately limited in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, make simple work-related decisions, complete a normal work-day and work-week without interruptions from psychologically based symptoms and perform at a

consistent pace without an unreasonable number and length of rest periods, respond appropriately to changes in work setting, and set realistic goals or make plans independent of others. (Tr. 253-54).

Her abilities, however, were not "markedly limited" or "extremely limited" in any of the categories. Id. Additionally, Plaintiff could maintain concentration, persistence and pace for simple tasks. (Tr. 255).

A psychiatric review completed on May 4, 2006, noted that Plaintiff had an affective disorder. (Tr. 432).   However, she only exhibited two instead of four required symptoms to qualify for a full disability in accordance with the Listings. Id. While rating her functional limitations, Plaintiff only had mild restriction of activities of daily living and difficulties in maintaining social functioning. (Tr. 253-54).   She had moderate difficulties in maintaining concentration, persistence or pace, but none of these were characterized as marked. Id. She also had no episodes of decompensation. (Tr. 439).

The final mental report, completed by Plaintiff's treating physician, Dr. Steve Willis, from the Care Center for Mental Health on December 17, 2007, stated that Plaintiff had an affective disorder. (Tr. 524-25).  In this report all of the symptoms were found present including thoughts of suicide. The report concluded that Plaintiff had extreme limitations in all of the following categories: daily living, social functioning, concentration, persistence and pace. (Tr. 525). Additionally, the report stated that she had continual repeated episodes of decompensation, each of extended duration. Id. However, Dr. Beers' reports from all of her meetings with Plaintiff contradict this report. (Tr. 446-58).

Finally, Plaintiff's psychiatric team noted that the earliest date of onset of her condition

13

was 1985. (Tr. 525).  As ALJ Ryan concluded, the team "noted multiple extreme functional limitations in a report dated December 17, 2007, but on January 9, 2008 found her able to travel to New Jersey for surgery." (Tr. 32) (internal quotations and citations omitted).

### E.    TESTIMONY AT HEARING

#### 1.    Testimony by Plaintiff

Plaintiff testified that she was living in Key West, Florida, but that she was in New Jersey for health reasons. (Tr. 608).  Plaintiff testified that she was forty-seven years old, unmarried and lived with her boyfriend in a house that they rented in Key West, Florida (Tr. 611). Additionally, Plaintiff said that she completed twelfth grade and had no difficulty reading or writing the English Language. Id. Plaintiff weighed 135 pounds, which was ten pounds lighter than her normal weight. (Tr. 612).  Plaintiff attributed the weight loss to stress. Id.

When asked to describe why she was unable to work, Plaintiff testified that she "[had] a lot of health problems." Id. On a day-in and day-out basis she indicated that she had "[b]ack, lower back pain, neck pain, arm pain, shoulder pain." Id. She then clarified that it was her right arm. Id. Additionally, Plaintiff stated that she had "severe panic attacks, emotional breakdowns, headaches due to stress." (Tr. 613).  Finally, she noted that the scars from her operations were painful on a daily basis. Id.

Plaintiff testified that the diskectomy that she had in 1998 did not take care of her back problems. (Tr. 622).  She indicated that she had been on and off medication for ten years. Id. Additionally she testified that she tried injection therapy, and "[i]nitially, I mean, that day it was great, but it didn't really work." (Tr. 622-23).  She later clarified that she meant that the pain was lessened but did not go away completely. (Tr. 625-26).

14

Plaintiff testified that she had a partial lumpectomy of her left breast in May of 2004. She has been taking Tamoxifen since May of 2005. (Tr. 623).  Regarding her arm, Plaintiff testified that she had used a brace when she was awake and she was not able to use her right arm for anything other then physical therapy. (Tr. 626-27).  Plaintiff expected to have another surgery, a full hysterectomy, because of fibroids and cysts on her ovaries. (Tr. 624).  She found out about that condition about nine months before the hearing and was taking Percocet as a treatment. Id.

In regards to her employment, Plaintiff testified that she last worked in January of 2007, as the cashier of a liquor store in Key West Florida. (Tr. 613).  She was in this position full time for approximately ten months. (Tr. 614).  Before that she indicated that she was a cashier in a deli for a short period of about two months. Id. Additionally, Plaintiff testified that she worked in catering from around 1985 until 2004 when she had to stop for medical reasons. (Tr. 614, 628). She indicated that she worked at some points in 2004 and then "a little time" in 2005. (Tr. 614).

As a caterer, Plaintiff worked mostly weekends, for four to eight hours depending on the type of party it was. (Tr. 628).  She would carry trays, dishes, glasses and plates of food, using both arms. (Tr. 628-29).  After she broke her arm she worked smaller parties.  Other people helped her carry trays and glasses and she would clean the tables. (Tr. 629).  Plaintiff testified that she "got switched to being in charge because [she] wasn't capable of, of carrying such heavy dishes." Id. She was only working one or two days of the week for about seven hours at a time and did not believe she could have handled more. (Tr. 630).  As a cashier, she was able to stand and sit at her own discretion. (Tr. 642).  She also had a bar back who helped her carry things. Id.

When she was not working Plaintiff indicated that she was at home watching television. (Tr. 630). She also was not getting dressed every day because she was depressed. (Tr. 631).

Plaintiff testified to the prescriptions that she was taking and identified her side effects as headaches, stomachaches, nausea and constipation. (Tr. 616). Additionally, taking Klonopin and Soma made her tired. (Tr. 637).

Plaintiff indicated that she did not do any housework, including cooking or cleaning, because it was too painful. (Tr. 616-17). Additionally, she stated that she went to the store sometimes. (Tr. 617). She testified that she did not shower because it was too painful so she took baths without help. (Tr. 618). She was not able to bathe every day because "it's just painful and I'm emotionally, it just, it hurts to get in and out of the bathtub." (Tr. 635). Plaintiff testified that "Dr. Brook [sic] doesn't want me to lift anything heavier than a gallon of water." (Tr. 657). She indicated that Dr. Baruch advised her that because she was still experiencing pain, if she had to lift anything she should do so with her left hand. Id.

Plaintiff has never had a driver's license, and testified that she takes public transportation. (Tr. 617). She testified that when she travels, she does not carry any luggage on the plane and she checks everything she has with the airline. (Tr. 618). When preparing to take a flight, Plaintiff indicated that she took Xanax and Klonopin in a slightly higher dosage than usual. (Tr. 632).

Plaintiff testified that she tried to take walks and could do so for about ten minutes, but at a slower pace. (Tr. 636). She also had difficulty remaining seated or standing for more than ten to fifteens minutes, but used no assistive devices. (Tr. 618-20).

She testified that because of her broken arm she got "pins and needles" and could not write for a long period of time. (Tr. 619). However, she had no difficulty with her left hand. Id.

Plaintiff's daughter passed away in January 2007 and since that time, Plaintiff does not

believe there is any work that she could do. (Tr. 643). When asked if she had breathing problems, Plaintiff testified that she had panic attacks that caused her to have difficulty breathing and to hyperventilate. (Tr. 620). She indicated these occurred three to four times a day since the death of her daughter. (Tr. 640). Before that she had only experienced them about once a day. Id. These attacks lasted between ten minutes and a half of an hour and afterwards she was "emotionally drained and physically in pain." Id. Plaintiff's medication for stress and depression helped her when she first took it to help her breathe and calm down when she felt the onset of a panic attack. (Tr. 621).

Plaintiff testified that she did not have difficulty getting along with people, but she had no interest in socializing. (Tr. 620). She indicated that she had problems remembering what had happened over the previous year and had a hard time concentrating. (Tr. 621).

### 2.     Testimony by Medical Expert

Dr. Martin A. Fechner, testified as an impartial medical expert in internal medicine. (Tr. 46, 644). Dr. Fechner discussed the physical ailments that Plaintiff suffered from, not her emotional difficulties, or any psychiatric concerns. (Tr. 644).

Dr. Fechner testified that based on his review of the medical evidence there was some degenerative disc disease, disc space narrowing and a herniated disk, however, "there was no direct evidence of nerve root involvement." (Tr. 645).

In regards to Plaintiff's breast cancer, Dr. Fechner testified that there were no distal metastases, it was considered stage zero and, "the chances are very good that this cancer's been completely healed, completely cured." (Tr. 647).

Dr. Fechner testified that he did not believe that any of the impairments met or equaled

17

any of the Listings. Id. Dr. Fechner's RFC for Plaintiff was "light" for walking and standing. Id. He testified that he believed she could walk or stand for an aggregate of six hours in an eight hour day, as well as sit for six hours in an eight hour day. Id. Additionally, she could lift ten pounds frequently. (Tr. 655-56). He testified that Plaintiff could lift twenty pounds occasionally using the left arm, with help from the right. She could only perform fine repetitive type motion occasionally with the right arm. (Tr. 647-48).

Dr. Fechner agreed that psychiatric problems could further reduce Plaintiff's ability to function. (Tr. 659).

## II. **STANDARD OF REVIEW**

When reviewing a final decision by a Commissioner of Social Security, the reviewing court will uphold the Commissioner's factual decisions if they are supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3); Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000). Substantial evidence is "more than a mere scintilla . . . but may be less than a preponderance." Woody v. Sec'y of Health & Human Services, 859 F.2d 1156, 1159 (3d Cir. 1988). It "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Not all evidence is considered "substantial,"

> '[a] single piece of evidence will not satisfy the substantiality test
> if the [Commissioner] ignores, or fails to resolve, a conflict created
> by countervailing evidence. Nor is evidence substantial if it is
> overwhelmed by other evidence–particularly certain types of
> evidence (e.g. that offered by treating physicians)–or if it really
> constitutes not evidence but mere conclusion.'

18

Wallace v. Sec'y of Health & Human Services, 722 F.2d 1150, 1153 (3d Cir. 1983) (quoting Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983)).  The ALJ must make specific findings of fact to support his ultimate conclusions. Stewart v. Sec'y of Health, Educ. & Welfare, 714 F.2d 287, 290 (3d Cir. 1983).

The "substantial evidence standard is a deferential standard of review." Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004).  As such, it does not matter if this Court "acting *de novo* might have reached a different conclusion." Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). "[T]he district court . . . is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992) (citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984)).  A court must nevertheless "review the evidence in its totality." Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997) (citing Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984)).  In doing so, the Court "must 'take into account whatever in the record fairly detracts from its weight.'" Schonewolf, 972 F. Supp at 284 (quoting Willbanks v. Sec'y of Health & Human Services, 847 F.2d 301, 303 (6th Cir. 1988) (internal citations omitted)).

To properly review the findings of the ALJ, the court needs access to the ALJ's reasoning.  Accordingly,

> '[u]nless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978) (quoting Arnold v. Sec'y of Health, Educ. & Welfare, 567 F.2d 258, 259 (4th Cir. 1977)).  The court must further assess whether the ALJ, when confronted with conflicting evidence, "adequately explain[ed] in the record his reasons for rejecting or discrediting competent evidence." Ogden v. Bowen, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)).  If the ALJ fails to properly indicate why evidence was rejected, the court is not permitted to determine whether the evidence was discredited or simply ignored. See Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000) (citing Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981)).

### III. APPLICABLE LAW

#### A.      THE FIVE-STEP PROCESS

A claimant's eligibility for benefits is governed by 42 U.S.C. § 1382.  A claimant is considered disabled under the SSA if he or she is unable to "engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C. § 423(d)(1)(A) (2004).  A claimant bears the burden of establishing his or her disability. § 423(d)(5).

To make a disability determination, the Commissioner follows a five-step process pursuant to 20 C.F.R. § 404.1520.  Under the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(I), 404.1520(b) (2011).  Substantial gainful activity is work that involves doing significant and productive physical or mental duties and is done (or intended) for pay or profit. 20 C.F.R. § 404.1510.  If the claimant establishes that she is not currently engaged in such

activity, the Commissioner then determines whether, under step two, the claimant suffers from a severe impairment or combination of impairments. 20 C.F.R. § 404.1520(a)(4)(ii). The severe impairment or combination of impairments must "significantly limit[] [a claimant's] physical or mental ability to do basic work activities . . ." 20 C.F.R. § 404.1520(c). The impairment or combination of impairments "must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1509. If the Commissioner finds a severe impairment or combination of impairments, he then proceeds to step three, where he must determine whether the claimant's impairment(s) is equal to or exceeds one of those included in the Listings. 20 C.F.R. § 404.1520(a)(4)(iii). Upon such a finding, the claimant is presumed to be disabled and is automatically entitled to benefits. 20 C.F.R. § 404.1520(d). If, however, the claimant does not meet this burden, the Commissioner moves to the final two steps.

Step four requires the Commissioner to determine the claimant's RFC and whether it sufficiently allows her to resume her previous work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(e). If the claimant can return to her previous work, then she is not disabled, and therefore cannot obtain benefits. 20 C.F.R. § 404.1520(f). If, however, the Commissioner determines that the claimant is unable to return to her prior work, the analysis proceeds to step five. At step five, the burden shifts to the Commissioner, who must find that the claimant can perform other work consistent with her medical impairments, age, education, past work experience and RFC. 20 C.F.R. § 404.1520(a)(4)(v). Should the Commissioner fail to meet this burden, the claimant is entitled to Social Security benefits. Id.

In a case where a claimant has mental impairments that may affect their ability to work, there is a second test required by the SSA. 20 C.F.R. §404.1520a. For claimants over the age of

eighteen, the Commissioner must determine: (1) whether a claimant has any medically determinable impairments and then specify the symptoms, tests, and findings that substantiate the claim, and (2) rate the degree of functional limitation resulting from the impairment(s). Id. The Commissioner will rate the degree of limitation in the following four functional areas: activities of daily living social functioning, concentration, persistence, or pace, and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3).   These will be rated on a five-point scale including rates of: none, mild, moderate, marked or extreme. 20 C.F.R. § 404.1520a(c)(4). Decompensation will be rated on a four-point scale: one episode, two, three, four or more episodes. 20 C.F.R. § 404.1520a(c)(4).  Only the last degree on each scale "represents a degree of limitation that is incompatible with the ability to do any gainful activity." 20 C.F.R. § 404.1520a(c)(4).  If a claimant is limited more than mildly, the Commissioner must determine if the mental impairment is severe. 20 C.F.R. §404.1520a(d).  At the ALJ hearing level and above, the Social Security Administration is required to document the application of this technique. 20 C.F.R. § 404.1520a(d)(2).

### B.       THE REQUIREMENT OF OBJECTIVE EVIDENCE

Under the Act, disability must be established by objective medical evidence. "An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require." 42 U.S.C. § 423(d)(5)(A) (2004).  Notably, "[a]n individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section[.]"  Id. Specifically, a finding that one is disabled requires:

[M]edical signs and findings, established by medically acceptable clinical or

22

> laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph . . . would lead to a conclusion that the individual is under a disability.

Id.; see 42 U.S.C. § 1382c(a)(3)(A) (2004). Additionally,

> Credibility is a significant factor. When examining the record, 'the adjudicator must evaluate the intensity, persistence and limiting effects of the [Plaintiff's] symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work-related activities.' To do this, the adjudicator must determine the credibility of the individual's statements based on consideration of the entire case record.

Rodriguez DeAguilu v. Astrue, 2011 WL 996223, at *9 (D.N.J. Mar. 27, 2011). A claimant's symptoms may then be discredited if they are not supported by the medical evidence. Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999) (deciding "[a]llegations of pain and other subjective symptoms must be supported by objective medical evidence"). The ALJ is required to evaluate and assess the degree to which the claimant is accurately stating his or her subjective symptoms or the extent to which they are disabling. Myers v. Barnhart, 57 F. App'x 990, 996 (3d Cir. 2003).

Factors relevant to symptoms, which the ALJ will consider, include: (1) daily activities; (2) location, duration, frequency and intensity of pain and other symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, claimant has received for relief; (6) any measures have or used to alleviate pain; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 416.929(c)(3).

## IV. ANALYSIS

23

In the present matter, Plaintiff alleges that the ALJ's findings are not supported by substantial evidence. Plaintiff alleges that ALJ Ryan erred in three specific instances. First, Plaintiff argues that in step three, ALJ Ryan failed to give proper weight to Plaintiff's testimony at trial and incorrectly refused to consider her impairments as equivalent to those in the Listings. (Pl.'s Br. 15-21; ECF No. 9). Additionally, Plaintiff argues that ALJ Ryan improperly concluded that Plaintiff had the RFC to perform the full range of light work. (Id. at 21-22). Finally, Plaintiff argues that ALJ Ryan incorrectly concluded that Plaintiff could perform past relevant work and therefore erred in not seeking the testimony of a vocational expert. (Id. at 22-24).

ALJ Ryan's findings are supported by substantial evidence.

## A.     DISABILITY END DATE

As noted in Defendant's brief, the eligibility period determined by ALJ Ryan appears to be a typographical error as ALJ Ryan considers evidence from after June 30, 2007, and because the record showed that Plaintiff was insured through March 31, 2011. (Def.'s Br. 2 n.2; ECF No. 12); see also (Tr. 71) (noting the date last insured overall); (Tr. 30, 32, 33) (where ALJ Ryan references medical records from after June 30, 2007).

## B.     SUBSTANTIAL EVIDENCE SUPPORTS ALJ'S CONCLUSION THAT PLAINTIFF'S SEVERE IMPAIRMENTS DO NOT MEET OR MEDICALLY EQUAL A LISTED IMPAIRMENT

There is substantial evidence to support the ALJ's finding that Plaintiff's impairments did not meet or medically equal a listed impairment in the Code of Federal Regulations (hereinafter, "CFR").

In the present matter, ALJ Ryan did not expressly note all of the Listings that he examined in determining whether or not Plaintiff's impairments met the Listings. (Tr. 24-34).

24

The Third Circuit, however, has held that an ALJ is not required to identify the explicit paragraphs in the Listings being compared, so long as the ALJ sets forth the reasons for his decision so that there is, "sufficient development of the record and explanation of findings to permit meaningful review." Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004) (citing Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 120 (3d Cir. 2000)); see also Scuderi v. Comm'r of Soc. Sec., 302 F. App'x 88, 90 (3d Cir. 2008) (holding, "an ALJ need not specifically mention any of the listed impairments in order to make a judicially reviewable finding, provided that the ALJ's decision clearly analyzes and evaluates the relevant medical evidence as it relates to the Listing requirements").

Here, ALJ Ryan noted that he examined Plaintiff's mental symptoms under Listings § 12.04. (Tr. 30).  However, he did not identify the paragraphs under which he analyzed Plaintiff's physical limitations.  It is clear from the ALJ's further discussion that he focused on her back and arm impairments which fall under the category for the Musculoskeletal System in the Listings, including §1.04 dealing with disorders of the spine and §1.07 dealing with the fracture of an upper extremity.

As the Supreme Court has held, "[f]or a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Sullivan v. Zebley, 493 U.S. 521, 530 (1990).  Therefore the ALJ's conclusion that the impairment did not qualify was not inappropriate.

### 1.   Back Impairment

According to the CFR, in order to find a disability for the spine, the disorder must:

result[] in compromise of a nerve root (including the cauda equina) or the spinal cord. With: (A) Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss . . . accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or (B) spinal arachnoiditis . . . or (C) lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively. . . .20 C.F.R.§ 404, Subt. P app. 1.04 (2011).

ALJ Ryan pointed to an MRI from November 3, 2005 showing "no direct evidence of any abnormal enhancing lesion throughout the lumbar spine." (Tr. 32). Additionally, he noted:

> [t]here was no direct evidence of metastatic disease, however; it did show L5-S1 degenerative disc disease and disc space narrowing and also L3-L4 left posterolateral disc protrusion encroaching upon the left neural foramen and extraforminal area, but no direct evidence of nerve root involvement. The rest of the spine appeared unremarkable.

(Tr. 32) (internal citations omitted).

As noted by ALJ Ryan, and in the record as outlined above, through all of Plaintiff's MRI scans, there was no evidence of nerve root compression based on her spinal conditions or scoliosis. (Tr. 32). Additionally, Plaintiff had negative straight leg raises. (Tr. 241-45, 555). None of Plaintiff's MRIs support a finding of spinal arachnoditis or lumbar spinal stenosis as required in the Listings. Finally, through Plaintiff's numerous hospital and doctors visits, there is a pattern of her ability to ambulate effectively and without help and good toe and heel walk as well as normal gait. (See, e.g., Tr. 180-81, 219, 243, 343, 451, 477, 487).

Plaintiff argues that medical records from Englewood Hospital in November of 2000, before the alleged onset date, support her claim for disability, however Plaintiff fails to address why that condition did not "incapacitate" her until 2004.

Therefore, there is sufficient evidence to support ALJ Ryan's conclusion that Plaintiff's

back ailment does not alone meet a Listing in the CFR.

2.        Right Arm and Shoulder Impairment

Under Section 1.07 of the CFR, a fracture of an upper extremity is a per se disability if functional use of the extremity was not restored or expected to be restored within twelve months of onset. 20 C.F.R. § 404, Subpt. P app. 1.07 (2011).  Functional loss is defined as "the inability to ambulate effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment, or the inability to perform fine and gross movements effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment." 20 C.F.R.§ 404, Subpt. P app. 1(B) (2011). Ambulation is defined as extreme limitations on the ability to walk. Id. An impairment to performing fine and gross movements means that it "interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 404 Subpt. P (2011).

As noted in section I(C)(3)(a) supra, there is substantial evidence to support a finding that Plaintiff's condition does not meet this listed impairment.  This is especially true of the records from the Kessler Rehabilitation Center, which showed the increase in her ROM over the period of alleged disability. (Tr. 356-413).  As ALJ Ryan noted, as of January 14, 2005, an MRI by Plaintiff's treating physician Dr. Baruch showed no evidence of a rotator cuff tear, mild subcoracoid bursitis and evidence of biceps tendinosis. (Tr. 31).  The report noted some edema in the rotator interval surrounding the long head of the biceps tendon suggesting tenosynovitis. Id. Plaintiff has failed in their burden to prove how this is total loss of movement or how it seriously interferes with Plaintiff's ability to independently initiate, sustain, or complete activities. Especially given her numerous filings noted above that included her ability to shop with her

27

daughter at the time, to take public transportation and to fly between Florida and New Jersey, and manage her finances. (Tr. 106, 123, 154).

Additionally, Plaintiff's injury occurred in June 2004, and as early as December of 2004 Dr. Baruch found her capable of returning to at least a light sedentary job. (Tr. 575). Additionally, Dr. Rajaraman, in May of 2005, found her capable of returning to work. (Tr. 243).

### 3.    Mental Impairments

ALJ Ryan concluded that, "[a]lthough [Plaintiff's] mental symptoms are severe and her treating physicians at Care Center for Mental Health indicated multiple 'extreme' limitations of functioning, the totality of the medical evidence does not support this claim . . ." (Tr. 30). Additionally, ALJ Ryan decided that, "[a] review of the medical evidence shows that [Plaintiff's] symptoms do not meet or equal Listing 12.04criteria [sic]." Id. According to the transcript, there is substantial evidence to support ALJ Ryan's conclusion. The Third Circuit has concluded:

> A treating physician's opinion on the nature and severity of an impairment will be given controlling weight only where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. If, however, the treating physician's opinion conflicts with other medical evidence, then the ALJ is free to give that opinion less than controlling weight or even reject it, so long as the ALJ clearly explains her reasons and makes a clear record. Salles v. Commissioner of Social Sec., 229 F. App'x 140, 148 (3d Cir. 2007) (citing Fargnoli v. Massanari, 247 F.3d 34, 43 (3d Cir. 2001), and Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir. 1991)).

In the present matter, ALJ Ryan explicitly rejected the assessment report from December 17, 2007 from the Care Center for Mental Health and Dr. Beers' letter of October 23, 2007 when concluding that Plaintiff's mental impairments did not meet the Listings. (Tr. 30).  ALJ Ryan found that the report seemed to be "somewhat of an exaggeration" and incompatible with reports from specific visits by Plaintiff from the same period. Id. In each of Plaintiff's meetings with the

Care Center for Mental Health she was found to be feeling guilty about her daughter's death, but doing well on her medications (Tr. 446-48). Additionally, the progress notes explicitly state that Plaintiff's memory was grossly intact, that she had no evidence of thought disorders and that she had no suicidal or homicidal ideations. Id. The report, however, found that she suffered from these ailments during the same period, without addressing the conflicting information. (Tr. 524-27).

Finally, the report noted that Plaintiff's ailments dated back to 1985. (Tr. 525). However, this is unpersuasive. As the Third Circuit has concluded, "the opinions offered by [Plaintiff's] treating physicians were conclusory and unsupported by the medical evidence, and failed to explain why ailments that had plagued [Plaintiff] for decades did not incapacitate him until [recently]." Jones v. Sullivan, 954 F.2d 125, 129 (3d. Cir. 1991).

Plaintiff alleges that ALJ Ryan failed to consider Plaintiff's diagnosis of PTSD. (Pl.'s Br. 17-18; ECF No. 9; see also Pl.'s Reply Br. 2; ECF No. 13). However, ALJ Ryan noted that Plaintiff had severe impairments that included her PTSD, indicating that he did consider her it in his analysis. (Tr. 29). Additionally, Plaintiff alleges that ALJ Ryan failed to consider the aspects of the mental consultations that found that Plaintiff was moderately limited in certain areas of functioning. (Pl.'s Reply Br. 2; ECF No. 13). As noted above, however, moderate limitations do not rise to the level required under the Listings.

Overall, there is substantial evidence to support the ALJ's finding that Plaintiff's impairments do not individually, or combined, equal any of the Listings.

### C. DETERMINATION BY ALJ THAT PLAINTIFF HAD RESIDUAL FUNCTIONAL CAPACITY ("RFC") TO PERFORM THE FULL RANGE OF LIGHT WORK AS DEFINED IN 20 C.F.R. § 404.1567(B) (2011).

After completing the third step of the analysis, if an ALJ has determined that a Plaintiff has serious disabilities that do not meet any of the Listings, then the ALJ must determine the RFC of the Plaintiff. Here, the ALJ must also determine the credibility of Plaintiff.

### 1.  Credibility Determination

When making a credibility determination, an ALJ must determine whether pain alleged by Plaintiff "could reasonably result from the medically determinable impairment [and] [s]econd, . . . the intensity and persistence of the claimant's disabling pain, and the extent to which it affects his ability to work." Diaz v. Comm'r of Soc. Sec., 39 F. App'x 713, 714 (3d Cir. 2002) (citing 20 C.F.R. §§ 404.1529(b), 404.1529(c)(1)).

Generally, the Court "defers to an ALJ's determination because the ALJ is present at the hearing and can assess a [plaintiff's] demeanor." Ochs v. Comm'r of Soc. Sec., 187 F. App'x 186, 190-91 (3d Cir. 2006) (citing Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003)). This Court has determined that, "it is well within the discretion of the Secretary to evaluate the credibility of a plaintiff's testimony and to render an independent judgment in light of the medical findings and related evidence regarding the true extent of such a disability." Alexander v. Shalala, 927 F. Supp. 785, 795 (D.N.J. 1995) (citing La Corte v. Bowen, 678 F. Supp. 80, 83 (D.N.J. 1988)). Legitimate bases for discrediting Plaintiff include: medical evidence that does little to support the complaints of pain, plaintiff's own testimony, and levels of plaintiff's activity. See Cruz v. Comm'r of Soc. Sec., 244 F. App'x 475, 481 (3d Cir. 2007) (medical evidence); see also Salles v. Comm'r of Soc. Sec., 229 F. App'x 140, 147 (3d Cir. 2007) (testimony).

30

There are many aspects of Plaintiff's testimony that have convinced courts in the Third Circuit to question a Plaintiff's credibility. In one such case the Court focused on admissions by a Plaintiff that he could live by himself, take care of basic needs, take public transportation, visit friends and travel to Florida to visit family. Ortega v. Comm'r of Soc. Sec., 232 F. App'x 194, 198 (3d Cir. 2007). Additionally, the Court found that a plaintiff's ability to take three hour flights as inconsistent with the claim of the inability to sit for long periods of time and limits on walking. Cerrato v. Comm'r of Soc. Sec., 386 F. App'x 283, 284-85 (3d Cir. 2010). Finally, the Court was swayed by a plaintiff's ability to travel alone and use public transportation, shop, and handle her own money. Malloy v. Comm'r of Soc. Sec., 306 F. App'x 761, 764-65 (3d Cir. 2009).

In the present matter, Plaintiff contends that ALJ Ryan's credibility determination was "mere speculation." (Pl.'s Reply Br. 6). ALJ Ryan found that:

> [a]fter considering the evidence of record...[Plaintiff's] medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment . . . .

(Tr. 31). This conclusion is supported by substantial evidence, given that Plaintiff performed substantial gainful activity in 2006. (Tr. 72). Plaintiff claims that in April of 2006 she had trouble getting out of bed and needed help with basic aspects of living, including getting dressed, cutting her food and paying her bills. (Tr. 151-55). Plaintiff's claims are inconsistent.

Additionally, as described above, Plaintiff noted that she could take care of some day-to-day activities, ride public transportation, drive from Key West to Miami or Fort Lauderdale and fly to New Jersey, and finally, that she would go shopping with her daughter. (Tr. 151-55, 632-

31

33, 634).  Therefore, the ALJ's credibility determination is based on substantial evidence.

### 2.    Residual Functioning Capacity Determination

The Third Circuit has noted that, "the ALJ's finding of residual functional capacity must 'be accompanied by a clear and satisfactory explication of the basis on which it rests.'" Fargnoli v. Massanari, 247 F.3d 34, 41 (3d Cir. 2001) (quoting Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)).

In the present matter, Plaintiff alleges that ALJ Ryan's determination that Plaintiff retains the RFC for light work is "merely conclusory and is not supported by the medical evidence." (Pl.'s Br. 21; ECF No. 9).  Plaintiff notes that ALJ Ryan chose to rely on Dr. Fechner "an internist" and ignored other doctors' opinions as to Plaintiff's limitations. (Id. at 21-22). Light work is defined as:

> [L]ifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. 20 C.F.R. § 404.1567(b).

As noted in the definition, Plaintiff must be able to do "substantially all" of the activities noted as light work.  Therefore, Dr. Fechner's testimony that Plaintiff can sit, stand or walk for about six hours of an eight hour day would fit her within the category of light work. Additionally, Dr. Fechner concluded that Plaintiff could lift twenty pounds infrequently, ten pounds frequently and perform only occasional fine manipulation with the dominant right hand. (Tr. 647-48, 655-56).

In making his RFC determination, ALJ Ryan examined the medical evidence from

Plaintiff's back injury dating back to 1998, the evidence from her arm surgery, records from treating physician Dr. Baruch and rehabilitation notes from after the surgery, as well as evidence regarding her breast cancer. See infra p. 7. Additionally, ALJ Ryan relied on the treatment notes from the Care Center for Mental Health. As determined above, there was substantial evidence to support ALJ Ryan's decision to discount Dr. Beers' letter, the Care Center for Mental Health evaluation, and Plaintiff's testimony in so far as it was inconsistent with the RFC determination.

ALJ Ryan particularly noted the fact that despite "Dr. Beers' opinions of multiple 'extreme' functional limitations; he [sic] has never suggested inpatient admission for [Plaintiff's] condition. Also, no medical report from any source indicated that [Plaintiff] was accompanied to treatment, nor did she use an assistive device." (Tr. 33).

When determining her RFC, ALJ Ryan noted that Plaintiff's breast cancer is no longer a problem, and addressed the severity of her shoulder and back pain noting that the evidence by her treating physician showed, "no evidence of rotator cuff tear, mild subcoracoid bursitis and evidence of biceps tendinosis. The report noted some edema in the rotator interval surrounding the long head of the biceps tendon suggesting tenosynovitis." (Tr. 31). As for Plaintiff's mental impairments, the ALJ acknowledged her suffering; however, he found many of her claims not credible because of evidence in the file, including "her ability to travel back and forward from Florida to New Jersey." (Tr. 33). This contradicts Plaintiff's testimony regarding severe limitations such as difficulty getting out of bed, requiring assistance to do many daily functions and only being able to walk two blocks before needing rest. (Tr. 151-59). Additional medical evidence to support ALJ Ryan's findings includes Dr. Rajaraman's report that Plaintiff had a

negative straight leg test and was negative for Waddell's signs.[3] (Tr. 242).

As a result of the medical evidence outlined above and his credibility determinations, substantial evidence supports ALJ Ryan's conclusion that Plaintiff has the RFC to perform the full range of light work.

### D.    PLAINTIFF'S CAPABILITY TO PERFORM PAST RELEVANT WORK AND THE NEED FOR A VOCATIONAL EXPERT

An ALJ must determine whether a claimant's RFC enables her to perform her past relevant work. McQueen v. Comm'r of Soc. Sec., 322 F. App'x 240, 243-44 (3d Cir. 2009). "If the claimant is capable of performing past relevant work, she is not considered disabled under the Social Security regulations." Beety-Monticello v. Comm'r of Soc. Sec., 343 F. App'x 743, 746 (3d Cir. 2009); see also, Weakland v. Astrue, 2009 WL 734713, *3 (W.D. Pa. Mar. 19, 2009) (citing Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir. 1991) ("it is well settled that disability is not determined merely by the presence of impairments, but by the effect that those impairments have upon an individual's ability to perform substantial gainful activity.")).

Plaintiff is considered capable of performing past relevant work when he or she, "can perform the functional demands and duties of the job as she actually performed it or as generally required by employers in the national economy." Malloy v. Comm'r of Soc. Sec., 306 F. App'x 761, 765-66 (3d Cir. 2009). Any work completed during the period of alleged disability can show that a claimant may be able to do more work then actually done or may show the ability for a claimant to engage in substantial gainful activity (hereinafter, "SGA"). 20 C.F.R. § 404.1571.

Plaintiff alleges that the ALJ erred in determining that she had engaged in SGA for the

---

[3]Waddell's Signs are used to determine the "nonorganic" manifestations of pain in

period of her disability. (Pl's Br. 19; ECF No. 9); see also Pl's Reply Br. 1; ECF No. 13. Plaintiff worked as a waitress, caterer, and cashier. Plaintiff alleges that because her job as a cashier was performed for only ten months and required an assistant she could not perform past work as a cashier. (Pl.'s Br. 22-24). It is clear that the ALJ did not determine that Plaintiff performed SGA which disqualified her from disability. (Tr. 24-34). However, the ALJ did use it as a factor in determining Plaintiff's RFC and credibility. Id.

The Dictionary of Occupational Titles ("DICOT") defines cashier work as "light," and notes that a cashier has a reasoning level of three, a math level of two, language level of two, involves writing and speaking and "Specific Vocational Preparation: Level 3" which is over one month up to and including three months. DICOT, § 211.462-010 (4th Ed. 1991).

Plaintiff claims that her mental assessments place her mathematics at a far lower level than required by DICOT. (Pl.'s Br. 24; ECF No. 9). However, Dr. Hasson, the author of the report Plaintiff refers to, did not find Plaintiff unable to "add, subtract, multiply, and divide all units of measure." Further, Plaintiff performed the four operations with "like common and decimal fracture," was able to "[c]ompute ratio, rate, and percent," to "[d]raw and interpret bar graphs," and to "[p]erform arithmetic operations involving all American monetary units." (Id. at 23, n.13; Tr. 246-52). Additionally, Plaintiff indeed performed the mathematical requirements of the job of a cashier in the ten months that she held the position. She indicated that she had a bar back to help her with lifting, but made no statements regarding any assistance required as a result of mathematical difficulties on the job. (Tr. 642).

According to this Court, "under proper disability procedures, [Plaintiff] must satisfy her

_____

patients whose conditions may be heightened by emotional effects.

burden by showing an inability to return to former work. The burden then shifts to the Secretary to show that there is other employment the applicant is capable of performing." Ferguson v. Schweiker, 765 F.2d 31, 36 (3d Cir. 1985). ALJ Ryan found that Plaintiff was capable of performing past work as a cashier, and the work "does not require the performance of work-related activities precluded by [Plaintiff's RFC]." (Tr. 33). ALJ Ryan additionally noted that "[Plaintiff] successfully performed this work through January 2007." Id. Plaintiff has over the required amount of specific vocational preparation because she worked for ten months. (Tr. 22).

Given that the substantial evidence supporting the determination that Plaintiff can return to past work, the ALJ properly concluded the analysis in the fourth step. The CFR notes that:

> The sequential evaluation process is a series of five "steps" that we follow in a set order. If we can find that you are disabled or not disabled at a step, we make our determination or decision and we do not go on to the next step. 20 C.F.R. § 416.920.

The ALJ did not err in deciding not to require the testimony of a vocational expert on what jobs Plaintiff was able to perform. The ALJ found, upon firm grounds, that Plaintiff was not disabled. This Court finds no error in that conclusion.

## V. CONCLUSION

For the reasons stated above, the final decision entered by ALJ Ryan is **affirmed**. An appropriate Order follows this Opinion.

Dennis M. Cavanaugh, U.S.D.J.

Date:         December 2, 2011
Original:     Clerk's Office
cc:           All Counsel of Record

36